UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| DAVID FLEMING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 8-53-B-K |
| | ) |
| CORRECTIONAL MEDICAL SERVICES, | ) |
| et al., | ) |
| Defendants. | ) |

## MEMORANDUM OF DECISION[1]
## GRANTING UNOPPOSED MOTION FOR SUMMARY JUDGMENT

David Fleming brought this civil action complaining of a lack of proper treatment of what he describes as an abscess in his mouth by defendants at the Maine State Prison. Defendants Correctional Medical Services, Inc. (CMS), Todd Tritch, M.D. Christopher Short, D.O., Anthony Olatunji, D.D.S., Teresa Kesteoot, Edie Woodward, and Charlene Watkins, have moved for summary judgment. Despite being granted a 90-day extension to respond to the motion for summary judgment, Fleming has failed to do so. Having concluded based on the undisputed facts material to Fleming's claim that the defendants are entitled to judgment as a matter of law, I grant the motion for summary judgment.

### *DISCUSSION*

**A.    Summary Judgment Standard**

"Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"

---

[1]    Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

United States v. Union Bank For Sav. & Inv. (Jordan), 487 F.3d 8, 17 (1st Cir. 2007) (quoting Federal Rule of Civil Procedure 56(c)).  I draw all reasonable inferences in favor of Flemming, but where he bears the burden of proof, he "'must present definite, competent evidence' from which a reasonable jury could find in [his] favor." Id. (quoting United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992)).

Fleming has not presented any evidence in defense of the motion for summary judgment. However, this court,

> may not automatically grant a motion for summary judgment simply because the opposing party failed to comply with a local rule requiring a response within a certain number of days. Rather, the court must determine whether summary judgment is "appropriate," which means that it must assure itself that the moving party's submission shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Advisory Committee Note to Rule 56 ("Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.").

NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 -8 (1st Cir. 2002).

I note that Fleming requested an extension of time to file his response to the motion for summary judgment in a motion filed December 4, 2008. (Doc. No. 62.)  In this motion Fleming indicated that he was having very serious health problems (not related to the health problem underlying this complaint) that prevented him from getting out of bed.  I granted Fleming the ninety-day extension he requested.  (Doc. No. 63.)[2]  That gave Fleming until March 11, 2009, to respond to the current motion; to date Fleming has not filed a response or any further request for an extension.

---

[2]    At the same time I denied his motion for appointment of counsel.

**B. Undisputed Material Facts**

On February 11, 2008, David Fleming, an inmate at the Maine State Prison, reported that he had fallen on some ice when walking on crutches to the chow hall. He complained of musculoskeletal pain, and did not report any injury whatsoever to his mouth. He was given hot packs and ibuprofen for his pain.

On February 12, 2008, at approximately 0900, David Fleming reported that he had been "vomiting blood" since starting to take ibuprofen the day before. On February 12, 2008, at 09:20, Mr. Fleming reported that his heart was "racing." He said he thought he was having an allergic reaction to medication. The nurse who examined him observed what she described as a small amount of blood on a tissue. Mr. Fleming was instructed to report any worsening of the bleeding.

On February 12, 2008, at 1300 a corrections officer called the medical department to report that David Fleming was collecting blood in a cup, and still reporting that he was "coughing up blood." When Betsy Boynton, R.N. approached Fleming with a pen light to examine his mouth, he said: "I thought it was related to the cough but I'm bleeding from the roof of my mouth," and he went on to say that he thought an "aneurism" had "burst" in his mouth. Nurse Boynton noted that Mr. Fleming had a wound on the roof of the mouth that appeared to her to be self-inflicted.

Charlene Watkins also saw David Fleming on February 12, 2008, having been called because Mr. Fleming had reported that he was "coughing up blood." However, when Watkins approached Mr. Fleming to look into his mouth he told her, before allowing Watkins to examine him, that he actually thought an "aneurism" had "burst" on the roof of his mouth. In Watkins' mind, Fleming's assertion that an aneurism had burst in his mouth was inconsistent with his

3

earlier report that he was "coughing up blood." Watkins did eventually, on her February 12th encounter with Mr. Fleming, observe an open wound which she believed was likely due to self-inflicted trauma. Ms. Watkins drew this conclusion because it made no sense to her that Mr. Fleming could have sustained a traumatic injury to the roof of his mouth without being aware of how the injury had occurred. Watkins informed Prison Security of her February 12th encounter with Mr. Fleming and referred him for a dental examination.

On February 12, 2008, at 1430 Mr. Fleming was seen in the Special Management Unit by Betsy Blake, R.N., who noted that gauze on the roof of Mr. Fleming's mouth was clear of any bloody discharge, and that he was in no apparent distress  Also on February 12, 2008, Mr. Fleming was seen by Dr. Anthony Olatunji, a dentist, who observed what appeared to him to be a traumatic puncture wound and moderate bleeding which was arrested with a small gauze pad.

On February 13, 2008, at 0015 Mr. Fleming was examined by Deb MacLeod, R.N., who observed a dark red bump on Mr. Fleming's palate, about 2 mm in diameter, and a 2'' x 2'' gauze pad in Mr. Fleming's mouth that was wet with saliva and had a small to moderate amount of bright red blood.

On February 13, 2008, at 1100, when Eileen Knight, R.N. saw Mr. Fleming at his cell, Fleming stated: "I'm gonna bleed out." Nurse Knight, however, saw only scant bloody drainage on the gauze in his mouth. When Nurse Knight saw Mr. Fleming later the same day, at 1330, she again observed only scant bleeding.

On February 14, 2008, at 0910 Nurse Knight examined Mr. Fleming and observed no bleeding. She did, however, note that she saw Mr. Fleming picking at the roof of his mouth.

On February 16, 2008, at 1200 Ann Voorhees, R.N. was called to the Special

Management Unit to see Mr. Fleming, who had reported that he was bleeding and needed more gauze. Nurse Voorhees noted no evidence of active bleeding.

On February 18, 2008, at 2330 Mr. Fleming reported that he had woken up to having blood from the roof of his mouth all over his cell. Kathy Kelly, LPN examined Mr. Fleming and found no bleeding, but did note blood on Mr. Fleming's thumbnail and first finger.

On February 24, 2008, at 1100 Mr. Fleming complained of bleeding in the mouth. Eileen Knight, R.N. examined him and noted a minimal amount of bleeding. On the same morning (February 24, 2008) a corrections officer submitted a report stating that he had seen Mr. Fleming vigorously brushing the roof of his mouth with a toothbrush. On February 26, 2008, Edie Woodward, P.A. saw a red, bumpy "mass" on the roof of Mr. Fleming's mouth, and she told Mr. Fleming that she would have Dr. Olatunji, the dentist then working in the prison, look at his mouth.

On February 26, 2008, Dr. Olatunji saw Mr. Fleming, examined his mouth, and observed a small, well-circumscribed soft lesion with a "stalk"-like base.  Because Dr. Olatunji did not see the healing he would have expected to see in the wound on the roof of Fleming's mouth he performed an incisional biopsy to determine its cause, and he was able to easily control the resulting bleeding using lidocaine, gelfoam and pressure. Dr. Olatunji's plan was to continue treatment of Mr. Fleming, as necessary, after receiving the results of the biopsy.

Later on February 26th Mr. Fleming reported to security that he was bleeding from the biopsy site, the medical department was contacted, and he was seen at 1530 by Betsy Blake, R.N. Fleming handed Nurse Blake approximately 10 gauze pads that were dry, with scant amounts of saliva-diluted blood on three of them. The gauze in Mr. Fleming's mouth was reported to be dry, and Mr. Fleming refused the fresh gauze pads that were offered to him.

On the same day at 1830, when Mr. Fleming was seen at his cell for the medication pass, he was offered a tea bag to use as a compress in his mouth. Mr. Fleming appeared to have only one or two gauze pads in his mouth, and no sign of bleeding. He refused any fresh gauze pads, and stated that he thought the problem had resolved.

Dr. Olatunji's last day of work at the Maine State Prison was February 27, 2008. On February 28, 2008, Mr. Fleming was seen by Victoria Matthews, D.D.S., who observed no bleeding and informed Mr. Fleming that she did not think the lesion on the roof of his mouth was related to the fall he had reported.

On March 4, 2008, at 0900, when Charlene Watkins saw Mr. Fleming again in follow-up, Fleming told Ms. Watkins that he was having copious bleeding from the wound in the roof of his mouth, and that she would not be able to remove the gauze with which he had "packed" the wound without causing severe bleeding. When Watkins examined the wound, however, she found only a small piece of gauze; the wound was not heavily "packed" as Fleming had said it was. Ms. Watkins removed the gauze and observed a small amount of discharge and some blood on the gauze, but nothing oozing from the site. Watkins prescribed an antibiotic for Fleming, but because she observed on March 4, 2008, no condition that caused her serious concern for Mr. Fleming's health or safety, she concluded that he did not need attention prior to a previously-scheduled appointment with the oral surgeon, which was to occur on March 10th.

On March 10, 2008 Mr. Fleming was seen by an oral surgeon, William Howell, D.D.S. He took another sample of the lesion on the roof of Mr. Fleming's mouth to be biopsied. The biopsy report described the lesion as a pyogenic granuloma, a healing ulceration of the palate.

At no time did Charlene Watkins observe any condition in Mr. Fleming's mouth that appeared to her to represent a serious health concern. Charlene Watkins never observed copious

bleeding occurring in or from David Fleming's mouth, and his reports of copious bleeding were inconsistent with her observations. Theresa Kesteloot provided no medical or nursing care to David Fleming at anytime.

Todd Tritch, M.D. had no involvement in examining or treating David Fleming's mouth, and was never asked to treat the condition described in the Complaint.  Dr. Tritch had no involvement whatsoever in making any decisions about how David Fleming's mouth would be treated – he did not tell anyone not to treat Mr. Fleming's mouth, or how to treat it. When Dr. Tritch returned to work in late February or early March of 2008, after having been out of the country for a month, he was informed by other providers that Mr. Fleming had a sore in his mouth, that he had been observed vigorously scrubbing the area of the sore with a toothbrush, and that he was scheduled to be seen by Dr. Howell, the oral surgeon.

During the months of February and March 2008, Christopher Short, D.O., who was working per diem at the Maine State Prison, worked there only on the following days: February 20, 23, 24 & 27, and March 12, 19, 22, 26, 29 & 30.  Dr. Short never treated David Fleming, he does not recall being asked to see Fleming during the months of February or March 2008, and he definitely did not refuse to see Fleming on any occasion when he needed urgent care. Dr. Short is familiar with David Fleming, having been a witness to the consequences of a brutal rape committed by Fleming, and as a result of that personal involvement he informed other members of the MSP medical staff that he would not feel comfortable treating Fleming.  Notwithstanding his reservations about treating Fleming, if Dr. Short had ever been aware that Fleming required emergency medical care, and that he was the physician best situated to provide that care, he would have done so.

7

Dr. Olatunji did not insist that the bleeding of Mr. Fleming's palate was self-inflicted. The reason Dr. Olatunji biopsied the lesion was to try to determine its cause. Dr. Olatunji responded to Mr. Fleming's complaints in a way that he believed then, and still believes, was appropriate to the conditions he observed.

It has never been the policy of CMS to deny or limit the delivery of medically necessary health care services, including dental services, to inmates. To the contrary, CMS policy states that access to care to meet serious health needs is the fundamental principle upon which all health service policies are based. In the months of February through April of 2008, when the events described in David Fleming's complaint took place, CMS had general dentists available, on average, thirty-six hours per week, or the approximate equivalent of eighteen days per month, to treat serious dental and oral health care needs, and an oral surgeon available, on average, two to four days per month for surgical needs that could not be managed by a general dentist. In February through April of 2008, CMS had a plan in place to provide 24-hour emergency medical and dental care to inmates. In February through April of 2008, CMS had a system in place pursuant to which any inmate in the Maine State Prison could submit a sick call slip which would be triaged by nursing staff, and as a result of this triage process the inmates were either assessed by a registered nurse or, when appropriate, referred to physicians or mid-level providers (nurse practitioners or physician assistants) for further evaluation and care.

David Fleming submitted at least ten sick call slips pertaining to his complaints of oral bleeding (as well as some sick call slips for other complaints) between February 14, 2008 and the end of March 2008. On each occasion Mr. Fleming's complaints were triaged by the nursing staff within one day of the sick call slip's submission, and on each occasion Mr. Fleming was either assessed by a registered nurse or referred to a physician or mid-level provider within a day

of his complaint being triaged. On several occasions he was assessed the same day the sick call slip was submitted. The Health Services Administrator for CMS is aware of no facts, and the medical record contains no evidence, which would cause her to believe that any physician or other health care practitioner at MSP ever denied David Fleming medically necessary health care services.

David Fleming's medical record reflects three events that cast doubt on his truthfulness in dealing with correctional health care staff: (1) a report of an incident in which Mr. Fleming was caught "cheeking" narcotic pain medication, i.e pretending to ingest prescribed medications, with the intention of saving the medication to be used, sold, or traded at a later time; (2) a report of an incident in which Mr. Fleming exhibited behavior inconsistent with his claim that he needed narcotic medications for pain control; and (3) a report that Mr. Fleming was observed "scrubbing his mouth very vigorously with his toothbrush" until he noticed that he was being seen by a corrections officer, at which time he "rolled the toothbrush over in his fingers and began brushing his tongue," and that he (Fleming) soon afterward rang the emergency button in his cell, complaining that his mouth was bleeding.

## C.    Fleming's Claims Fail under the Eighth Amendment Deliberate Indifference Standard

In their motion for summary judgment, the defendants summarize their position as follows"

> (1) The evidence demonstrates that Defendants Short, Tritch, and Kesteloot were not personally involved in providing the medical and dental care about which the Plaintiff complains, so they cannot be held liable under 42 U.S.C. §1983; (2) The evidence conclusively refutes the Plaintiff's claims that Defendants Woodward, Watkins, and Olatunji, who did participate in his care, were deliberately indifferent to his serious medical needs, so those Defendants cannot be held liable under 42 U.S.C. §1983 for violating the Plaintiff's Eighth Amendment rights; and

>   (3) The evidence demonstrates that no CMS policy was a moving force behind the alleged deprivation of the Plaintiff's constitutional rights.

(Mot. Summ. J. at 1-2, Doc. No. 59.)

First, there is no dispute that Short, Tritch, and Kesteloot did not have personal involvement in Fleming's care and they are entitled to judgment. Cepero-Rivera v. Fagundo, 414 F.3d 124, 129 (1st Cir. 2005) ("[O]nly those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable.").

With regards to the other defendants, although Fleming's complaint and amended complaint do not make it crystal clear that he is pressing his claim solely under the Eighth Amendment of the United States Constitution, the defendants have fairly construed this action as one brought under that amendment, and Fleming, in his silence, has not contested this construction.

With respect to the Eighth Amendment deliberate indifference standard in the context of medical care for inmates, the First Circuit summarized in Ruiz-Rosa v. Rullan:

>   For medical treatment in prison to offend the Constitution, the care "must involve 'acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.'" Feeney v. Corr. Med. Servs., Inc., 464 F.3d 158, 161 (1st Cir.2006) (quoting Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). Deliberate indifference in this context may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with "actual knowledge of impending harm, easily preventable." Id. at 162 (internal quotation marks omitted). Deliberate indifference means that "a prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Burrell [v. Hampshire County], 307 F.3d [1,] 8 [(1st Cir. 2002)](quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Therefore, substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment are all insufficient to prove a constitutional violation. Feeney, 464 F.3d at 161-62.

485 F.3d 150, 156 (1st Cir. 2007).

"'Deliberate indifference' thus defines a narrow band of conduct in this setting." Feeney, 464 F.3d at 162. "The care provided must have been '"so inadequate as to shock the conscience."'" Id. (quoting Torraco v. Maloney, 923 F.2d 231, 235 (1st Cir.1991), in turn quoting Sires v. Berman, 834 F.2d 9, 13 (1st Cir.1987)).

On these undisputed material facts there is no question that the response to Fleming's complaints about his mouth condition -- whether self-inflicted or not -- does not fall within the "narrow band of conduct" that is actionable under the Eighth Amendment deliberate indifference standard. Without an underlying constitutional violation there can be no supervisory liability or liability of an unconstitutional policy or custom. See Nieves v. McSweeny, 241 F.3d 46, 50 (1st Cir. 2001).

### *Conclusion*

For these reasons I grant the motion for summary judgment as to all Fleming's claims against Correctional Medical Services, Inc. (CMS), Todd Tritch, M.D. Christopher Short, D.O., Anthony Olatunji, D.D.S., Teresa Kestaloot, Edie Woodward, and Charlene Watkins.

*So Ordered.*

March 23 , 2009                                    /s/ Margaret J. Kravchuk
                                                   U.S. Magistrate Judge